Edward MARCINSKI, Appellant,

v.

UNITED STATES, Appellee.

No. 83–75.

District of Columbia Court of Appeals.

Argued March 15, 1984.

Decided June 18, 1984.

James R. Klimaski, Washington, D.C., appointed by this court, with whom Elizabeth Karasik, Washington, D.C., was on the brief, for appellant.

Wallace H. Kleindienst, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before BELSON, TERRY, and ROGERS, Associate Judges.

PER CURIAM:

Appellant was convicted by a jury of remaining in a room of the U.S. Capitol Building with intent to disrupt the orderly conduct of official business of the United States Senate in violation of D.C.Code § 9–112(b)(3) (1981).[1] On appeal he contends that the trial court committed reversible error in failing to instruct the jury that appellant must have had the specific intent to violate the law with knowledge of the statute's existence. We affirm.

I.

On August 18, 1982, while the Senate was in session, appellant entered the visitor's gallery of the Senate chamber. He

---

[1] Appellant was sentenced to 60 days confinement; the execution of sentence was suspended, and he was placed on unsupervised probation for one year.

sat in the front row and shortly thereafter unfurled a nine foot banner over the gallery railing, down into the Senate chamber. The banner was yellow with black letters, approximately 45 inches wide and read: "Enough is enough—is enough. What's wrong with Congress? Bigger than any crime." The presiding officer of the Senate suspended the on-going debate and called for order in the Senate galleries, stating there was a disruption in the gallery and directing the sergeant-at-arms to restore order. (Cong.Rec. S 10750 (daily ed. Aug. 18, 1982)). Appellant was arrested by two U.S. Capitol police officers who escorted him out of the gallery.

The issue at trial was whether appellant had unfurled his banner with the requisite intent. The government argued that he acted with the specific intent to disrupt the proceedings and to call attention to himself. Two U.S. Capitol police officers testified that six months earlier appellant had entered the gallery of the U.S. House of Representatives and been arrested after unfurling a banner. Because of this incident, a "lookout" had been issued with appellant's picture and the officers had recognized and watched appellant as he entered the Senate gallery. They did not see the banner when he entered the gallery, but after he was seated, one officer saw appellant "leaning over on the front row" and "saw some motion with his arms, under his coat."

Appellant testified that he was 65 years old and lived in New Britain, Connecticut, having retired in 1975, after working 35 years as a machinist. He held certain convictions which he wanted to express to Congress and believed personal contact was the best tactic. He wrote many letters to various members of Congress and made several trips to Washington, D.C., in order to get the attention of the legislators, but became frustrated with his attempts to speak directly with an elected official because every time he attempted to do so "somebody would shove a young lawyer at [him] to hear [him] out."

His intention in carrying the banner into the Senate and unfurling it was, he testified, to "get somebody's attention to hear me out." He denied on direct examination that he had intended to disrupt the orderly workings of the Senate, claiming he had carefully selected a time when few people were on the Senate floor. On cross-examination he admitted he had previously taken a banner into the visitors gallery of the House of Representatives, unfurled it and stated "we the people propose," whereupon the proceedings were suspended and he was arrested. He also admitted he was aware that bringing a banner into the Senate would disrupt the proceedings because he had disrupted Congress in that way in the past. On redirect he said he did not understand exactly what had happened to him when he had been arrested in the House except that he had spent the night in jail and then went, with counsel, to be arraigned on criminal charges; he had eventually been convicted. Regarding his state of mind when he had previously gone to the House gallery, appellant testified

> I didn't think there was anything to be breaking the law. I thought, maybe, it would bend the rule of the House, or something like that. But I think the law was something I hadn't anticipated. Of course, there is always that—ignorance of the law is no excuse. But you can also say the reverse is true.

In view of the House incident, however, appellant admitted he knew before going into the Senate gallery that he had done something wrong; he testified,

> I believe, though, I recognize the fact that I did something wrong—I did something—maybe felt I did something right, but wrong in the way I did it. . . .

## II.

At trial appellant requested the court to give the following instruction on specific intent: "A person who knowingly does an act which the law forbids, *intending with bad purpose either to disobey or disregard the law*, may be found to act with

specific intent." Instead, the trial court, after reading the statute [2] to the jury, instructed that the government had to prove beyond a reasonable doubt that appellant had "entered or remained in a room with a part of the Capitol building with *specific intent to disrupt the orderly conduct of official business.*" The court gave the standard jury instruction on intent, Criminal Jury Instructions for the District of Columbia, No. 3.01 (3d ed. 1978), which states: "A person who knowingly does an act which the law forbids may be found to act with specific intent." [3] The court defined "knowingly" as meaning "voluntarily and purposely, and not because of mistake, inadvertence or accident," and explained to the jury that appellant's defense was lack of intent to disrupt Congress.

Appellant contends that unless the jury found that he was acting with knowledge that he violated the law, his First Amendment [4] rights would be infringed because the activity in which he was engaged is the type of pristine and classic First Amendment activity which courts refuse to chill by arrest in the absence of an intent to violate the law. Without challenging the power of Congress to enact the statute (§ 9–112(b)(3)) or suggesting that intentionally disrupting the orderly conduct of Congress is not a violation of that statute, appellant contends that despite his prior notice to desist from such conduct, he cannot be found guilty of violating § 9–112(b)(3) unless the jury finds that he intended to disrupt Congress and did so with knowledge that it was a violation of law.

This court has previously examined the intent which is necessary for a conviction under D.C.Code § 9–112. In *Smith v. United States*, 460 A.2d 576, 579–80 (D.C. 1983) (per curiam), the defendants argued that § 9–112(b)(4) required prior knowledge of its existence for violation. Subsection (4) prohibits the knowing and willful uttering of certain language or engaging in disorderly or disruptive conduct with the intent to impede, disrupt, or disturb the orderly conduct of Congress. The defendants had twice disrupted a Senate subcommittee hearing by standing on chairs, holding placards, and chanting, among other things "stop this committee." They requested a special instruction for "willingly" and "knowingly" based on *Arshack v. United States*, 321 A.2d 845, 852 (D.C. 1974).[5] The court held in *Smith* that the

2. D.C.Code § 9–112(b)(3) (1981) provides:

(b) It shall be unlawful for any person or group of persons willfully and knowingly:

(3) To enter or to remain in any room within any of the Capitol Buildings set aside or designated for the use of either House of the Congress or any member, committee, subcommittee, officer, or employee of the Congress or either House thereof *with intent to disrupt* the orderly conduct of official business.

(Emphasis supplied).

3. The court's instruction to the jury on intent omitted the bracketed portion of the standard instruction which appellant had requested; *see infra* text accompanying note 13. The full instruction given to the jury on intent was:

[I]ntent means that a person had the purpose to do a thing. It means that he acted with the will to do the thing. It means that he acted consciously or voluntarily and not inadvertently or accidentally.

Some criminal offenses require only a general intent. Where this is so and it is shown that a person has knowingly committed an act which the law makes a crime, intent may be inferred from the doing of the act.

Now other offenses require a specific intent. In this case this charge, this offense requires a specific intent. Specific intent requires more than a mere general intent to engage in certain conduct or to do certain acts. A person who knowingly does an act which the law forbids may be found to act with specific intent.

4. The First Amendment provides that:

Congress shall make no law ... abridging ... the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. Amend. 1.

5. In *Arshack, supra,* 321 A.2d at 852, the trial court instructed:

The term "willful" as used in the statute means that the act was committed by the defendants voluntarily, with knowledge that it was prohibited by a law and with the purpose of violating the law and not by mistake, accident, or in good faith. To act willfully means to do an act without a lawful excuse.

defendants need not have known of the existence of the statute before they violated it, and distinguished *Arshack,* which had upheld restrictions on protesters who had blocked Capitol building corridors after having received prior notice of the limits of their activity under § 9–112(b)(5):

> *Arshack* is not authority for the proposition that the accused must have known of the statute's existence before D.C. Code § 9–112 can be violated. In cases of alleged violations of § 9–112(b)(5), a defendant only has to intend to impede passage through the hallways of Congress. This court was saying nothing more in *Arshack* than that the instruction the trial court gave was in no way prejudicial to the *defendants* but was an adequate response to the specific instruction which they requested. Similarly, in order to violate D.C.Code § 9–112(b)(4) the appellants had to intend to disrupt a session of Congress.

*Smith, supra,* 460 A.2d at 580 (emphasis in original).[6]

■ We hold that to convict appellant of violating § 9–112(b)(3), the jury would have to find that he remained in a room within the Capitol with the intent to disrupt the orderly conduct of official business, but that it would not have to find that he acted with the specific intent to violate the law

> The word "knowingly" as used in the statute means that the defendants acted voluntarily and purposely and not because of a mistake or an accident or through inadvertence.

6. In *Smith, supra,* 460 A.2d at 580, the trial court instructed:

> An act is done willingly and knowingly if it is done voluntarily, purposefully and deliberately and with intent to violate the law, and not because of mistake or accident or inadvertently.

7. This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: com-

with knowledge of the statute's existence. Accordingly, the trial court's instructions were sufficient to satisfy the requirements of § 9–112(b)(3). *See Smith, supra,* 460 A.2d at 580. "The purpose of the statute is to permit Congress to carry out the people's business unhindered by serious disruption." *Arshack, supra,* 321 A.2d at 848 (citing H.R.Rep. No. 745, 90th Cong., 1st Sess. (1967), U.S.Code Cong. & Admin. News 1967, p. 1739). Section 9–112(b)(3) defines the prohibited conduct in terms of the intent which is required for its violation and the statute is the type of government regulation which falls within the Supreme Court's definition of the least restrictive means available to accomplish its limited purpose. *See United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968);[7] *Arshack, supra,* 321 A.2d at 848–49 (upholding constitutionality of § 9–112(b)(5), noting that while in some respects defendants' conduct (blocking corridors in the Capitol building) may have First Amendment overtones, it may be constitutionally proscribed); *Morissette v. United States,* 342 U.S. 246, 273, 72 S.Ct. 240, 255, 96 L.Ed. 288 (1952) (where Congress has defined the required intent, unnecessary to instruct that a conviction requires knowledge and intent to violate the statute, but court will not infer Congress intended to eliminate intent element altogether).

pelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien, supra,* 391 U.S. at 376–77, 88 S.Ct. at 1678–1679 (footnotes omitted). *See Community for Creative Non-Violence v. Watt,* 227 U.S.App. D.C. 19, 703 F.2d 586 (en banc), *cert. granted,* —— U.S. ——, 104 S.Ct. 65, 78 L.Ed.2d 80 (1983), applying analysis of *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), and *O'Brien* in the "balancing of First Amendment freedoms and their societal costs." 703 F.2d at 595.

Unlike the statutes at issue in the cases on which appellant relies—*Dellums v. Powell,*[8] 184 U.S.App.D.C. 275, 566 F.2d 167 (1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Washington Mobilization Committee v. Cullinane,*[9] 184 U.S.App.D.C. 215, 566 F.2d 107 (1977); *Jeannette Rankin Brigade v. Chief of Capitol Police,*[10] 342 F.Supp. 575 (D.D.C.), *aff'd,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972)—the statute as applied to appellant is not potentially vague or overbroad in defining the conduct which is prohibited. *See Arshack, supra,* 321 A.2d at 848 (§ 9–112(b)(5) is "a narrowly drawn statute 'evincing a legislative judgment that certain specific conduct be limited or proscribed'") (quoting *Edwards v. South Carolina,* 372 U.S. 229, 236, 83 S.Ct. 680, 684, 9 L.Ed.2d 697 (1963)). The *Dellums* court held that because it was "impossible for anyone to tell when his otherwise constitutionally protected behavior (or that of his group) had become 'more disruptive or more substantial (in degree or number) than that normally engaged in by tourists and others routinely permitted on the Grounds,'" the statute was unconstitutional unless officials warned individuals, and gave them an opportunity to comply, before arresting them. *Dellums v. Powell, supra,* 184 U.S.App.D.C. at 288–89, 566 F.2d at 180–81 (quoting *United States v. Nicholson,* Nos. 20210–69A et al. (D.C.Ct. of Gen.Sess. June 19, 1969), *aff'd,* 263 A.2d 56 (D.C.1970)). Certainly on the facts of this case the statutory language is sufficiently specific to protect against conviction as a result of being found in a particular place doing what a citizen could reasonably assume was lawful and constitutionally protected activity.[11] *Accord Spence v. Washington, supra* note 7, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842.

Appellant clearly knew that his conduct would be disruptive. Unfurling a nine foot banner with a provocative message into the Senate Chamber was conduct obviously designed to cause disruption. He had previously caused a similar disruption of a session of the House of Representatives. Appellant admits that he intended to draw attention to himself in the Senate gallery, and concedes that his prior arrest in the House of Representatives was constitutional and can fairly be interpreted as notice to desist. Appellant's Brief at 7; *see Dellums, supra,* 184 U.S.App.D.C. at 289 n. 31, 566 F.2d at 181 n. 31. Therefore, this is

**8.** Application of D.C.Code § 9–124 (now codified at § 9–113), prohibiting parades or assemblages in U.S. Capitol grounds by individuals assembled on the Capitol grounds.

**9.** Application of D.C.Code § 22–1121(2) (1973), failure to move on, and D.C. Police Regulations, Art. VI § 5a, police line regulation.

**10.** Application of 40 U.S.C. § 193(g) (1964) prohibiting assemblages on U.S. Capitol grounds.

**11.** Although the statutory language is clear, we have also considered its legislative history in response to appellant's contention that courts have looked there, rather than relying on the maxim that ignorance of the law is no defense, to determine whether an accused can be convicted only if he realized his acts were unlawful. (Reply Brief at 4). *McIntosh v. Washington,* 395 A.2d 744, 756 (D.C.1978) (whether *scienter* is a necessary element of statutory crime is a question of legislative intent). The House Report described the specific activity to be prohibited by enactment of Section 112:

The nature of the legislative process, and the problems which now confront us as a Nation, are such that people with strong feelings must be assured of the rights of freedom of expression and of assembly and the right to petition their Government, but under no circumstances should the guarantee of these rights be extended to a license for a minority to delay, impede, or otherwise disrupt the orderly processes of the legislature which represents all Americans.... The purpose of [the amendment adding the words "and knowingly" after the word "willfully"] is to make it quite clear that the provisions of this subsection do not apply to an individual or a group of individuals who, either by accident or without intent to violate these provisions, do any of the acts which are prohibited by the reported bill. H.R. 745, 90th Cong., 1st Sess. (1967), *reprinted in* 1967 U.S.Code Cong. & Ad.News 1739, 1740. As applied to the facts of the instant case, this supports our conclusion that the required statutory intent was properly reflected in the trial court's instructions to the jury.

not a situation, as appellant contends,[12] in which a person was engaged in otherwise innocuous and constitutionally protected conduct, in ignorance of the fact that the actions would disrupt a House of Congress and without intent to cause such a disruption. That situation is not before us, and we hold only that where a defendant has taken actions which are obviously disruptive with the specific intent to cause a disruption of Congress, it is sufficient to constitute a violation of § 9–112(b)(3) and the jury need not specifically find that the defendant knew of the existence of the statute when he acted.[13] Thus, there was no infringement of appellant's First Amendment rights. *See Arshack, supra,* 321 A.2d at 848–49.

Appellant also contends the trial court committed harmful error when it failed to include in its charge to the jury the bracketed portion of "Red Book" instruction 3.01, which states that "A person who knowingly does an act which the law forbids [, intending with bad purpose either to disobey or disregard the law,] may be found to act with specific intent." He argues that this omission diluted any meaningful distinction between specific and general intent. He relies on *United States v.*

*Bryant,* 137 U.S.App.D.C. 124, 130 n. 10, 420 F.2d 1327, 1333 n. 10 (1969), which held that deletion of the bracketed portion of the instruction was not plain error in cases involving attempt or assault with intent to commit a substantive crime, and noted that inclusion of the bracketed language would avoid any possible defense objection; the court refrained, however, from holding that a defendant was entitled to a charge which requires a "purpose to disobey or disregard the law." Appellant contends the *Bryant* court was implicitly mandating that specific intent in statutory offenses must contain this element unless the statutory language affirmatively creates a different level of intent.[14]

As a general proposition, we agree that for criminal offenses in which the requisite intent is not defined in the statute establishing the offense, normally some additional language is appropriate when the bracketed language is not used. The additional language would, presumably, define the required intent in terms of the facts of the case. However, where, as here, the statute defines the intent which is required for its violation, the use of the

**12.** Appellant states (Brief at 7) that prosecuting "individuals who unintentionally violate ordinances in the course of activities believed in good faith to be protected under the First Amendment would violate the language and the spirit of the standard framed in *O'Brien,* and repeatedly endorsed in subsequent decisions. *Washington Mobilization Committee v. Cullinane, supra,* 184 U.S.App.D.C. at 228, 566 F.2d at 120; *Arshack, supra,* 321 A.2d at 849; *Jeanette Rankin Brigade, supra,* 342 F.Supp. at 584."

**13.** In *Arshack, supra,* 321 A.2d at 853, this court quoted with approval the trial court's opinion, *United States v. Gaeng,* 101 Wash.D.L.Rep. 1973, 1979 (Super.Ct.D.C.1973), H. Greene, J.:

None of this should be taken to mean that motivations and purposes, to the extent that they are ascertainable, should be wholly disregarded in the legal process. In criminal cases, the gravity of the offense will be weighed at the time of sentencing, together with the character, background, and the apparent purposes of the offender. But to permit a man's claim that he acted in accordance

with the dictates of his conscience to constitute a defense to an otherwise criminal act would lead the instruments of justice down from the certainties of the rule of law, equally and impartially applied to ascertainable facts, to an impossible search for motivations and beliefs. In that kind of search, for which there could almost by definition be no objective standards, the courts, and hence the weight of government, would inevitably end up protecting those whose philosophy happened to be favored by the men in power at any given time while finding wanting the purpose, the belief, and the sincerity of those who harbored an opposite viewpoint.

**14.** Appellant has referred us to a letter from the editor of the standard jury instructions suggesting that when the bracketed language is omitted, alternative language tailored to the particular facts of the case be added to distinguish between specific and general intent. Letter of July 13, 1978, to Judges of the United States District Court for the District of Columbia and the District of Columbia Superior Court. Appellant's Reply Brief, Appendix 1.

statutory language to replace the bracketed language is sufficient.

*Affirmed.*